This morning we will hear 2024-50284, United States of America v. Damon Nolan Simpson. Is that correct? Is your client's name Damon? I think that's right. Okay. Thank you, Chief Judge Elrod, and may it please the Court. This Court has made clear that disarming someone simply because they have been convicted of a crime that is classified as a felony today does not meet the historical rigor required by Bruin and Rahimi. Instead, this Court has recognized two specific categories of offenses that justify disarming someone under 922g1 consistent with the Second Amendment. First, offenses that were subject to capital punishment or permanent estate forfeiture at the founding, and second, violent offenses. And this Court has left the door open for as-applied challenges to 922g1 by defendants like Simeon whose underlying convictions do not fall into either category. None of Simeon's underlying convictions were punishable by death at the founding, and none of his convictions involve violence, misusing a gun, or harming anyone. The government has failed to meet its burden of showing a historical tradition of disarming someone like Mr. Simeon, so this Court should find that 922 violates the Second Amendment as applied to him and vacate his conviction. Well, what about Mr. Simpson's conviction for evading arrest? We have a case called Reyes. For a recent case, I think we've got some, maybe we have some 28Js on that. How can you argue that evading arrest is not disarmable in light of Reyes? So I think in Reyes, there's not a lot of reasoning there, but I think the Court looked to the underlying conduct that led to the evading arrest, and that involved a drive-by shooting that was being evaded. That was kind of the incident, which is obviously a violent offense that involves misusing firearms. And I think as a broader picture, we kind of need to take a step back here and look, so before I do that, I just want to quickly say, none of his predicates are punishable by death at the founding, and I think the only one the government ever argued was punishable by death was his possession of cocaine. Kimball rejected that for drug traffickers, and those analogs apply even more weakly here. So we're really looking at this violent line of cases that starts with Bullock, and then Schnur, and then Bettencourt, and then Reyes. So how do we make sense of this violent line of cases? Each of those, the historical analog that this Court found to support disarming those individuals, were the going-harmed laws, which the Supreme Court discussed in Rahimi at length. And those prevented violence by people who had menaced others with firearms, and who had engaged in conduct that almost necessarily led to actual violence. So I think when we go through those cases that this Court has decided, Bullock, we have aggravated assault, manslaughter, and he literally menaced others with firearms. He shot into a crowd. The going-armed laws are a good fit there. So we go to Schnur, and he brutally attacked someone, didn't have a weapon, so the going-armed laws aren't quite as close of a fit, but we look to the affray laws, and also look at the nature of the conviction, aggravated battery with a deadly weapon, I think, and that's a close fit. Then we go to Bettencourt, and in Bettencourt, he gets convicted of aggravated assault because he's going at high speeds, and he ends up injuring a couple people. I don't, I mean, you know, going-armed laws, he's not using an arm or a weapon, but, you know, aggravated assault does seem like a violent crime, something that, you know, necessarily leads to actual violence. And he harmed someone, so it makes sense there. And then we get to Reyes, and again, we have, you know, evading arrest doesn't seem like, you know, an inherently violent crime, but he was evading arrest from somewhere where people were shooting, and so the going-armed laws provide some support there, but I think... You're looking to the individualized circumstances of each crime, while evading arrest in this particular circumstance, or, right? Is that what you're saying? Yes, and I think that's what this court has looked at. You know, in Bettencourt, this court looked at the details of the underlying arrest, and so I think when we take, I think, you know, this court, it has not always been entirely consistent. You know, Schnur kind of suggested we're going to do an elements-based approach, like we do under the ACCA, and then Bettencourt kind of said, oh, no, we're going to, you know, look to the details underlying the offense, and then Kimball kind of did a different... What does 922g1 say, though? The text of the statute that allows the disarmament, right? What are we looking to? Yes, to the prior felony conviction. We're not looking to the prior circumstances of the facts, right? We're looking to the, you have to be convicted of an offense that's punishable by more than a year, right? I agree with that. The statute doesn't say, you showed violence in your previous crime, or something like that. I agree with that, and I think there are well-founded reasons for not looking under, and a lot of that is part of... There's also the jury problem, and I don't know... I don't know if the jury found that fact, right? I can't find that. Absolutely, and there's a difficulty in going back and re-litigating past crimes, defendants, you know, the details of these crimes, and, you know, here, a lot of these are older crimes, so we have very few details for a lot of them, but, you know, it's difficult to re-litigate these. But anyway, so once you get to, you know, this case, where evading arrest is not an inherently... I don't know if that's true, is if we were to hold that evading arrest can be sometimes, and can be other... is not other times, aren't we doing exactly the peek beneath to see what happened here that we're not going to be at liberty to do? That's... I'm sympathetic to the proposition, but I just don't think it plays out. I think if you ask most people on the street, they would say evading arrest causes risk for all kinds of bystanders and things, usually. So, Chief Judge Ellert, I think because we're in the Second Amendment context, kind of this broad risk is not quite the right analysis. We're looking at, does an evading arrest conviction make it more likely that if someone is armed, that they are going to inflict violence on someone? You know, we're very much in the gun violence, you know, arena, and there are many offenses that you could conceive of as, you know, posing some risk to the public at large, but they don't show any proclivity for violence, and that's really... Not necessarily. I mean, to get... maybe put a finer point on this, evading arrest could include running through the woods and hiding out in an abandoned barn, or it could include getting in a vehicle on Poitras Street and going 90 miles an hour towards the interstate, all which would not involve a firearm, but one is putting... puts the public at great risk, and the other, maybe not so much. So, again, how do we get around getting so granular into the facts and finding facts and applying that? So, Judge Engelhardt, I agree. I don't think that the court should go into the facts. The court in... Bettencourt and Reyes had shown some inclination to do that, but I think your two hypotheticals also kind of prove the point that evading arrest isn't inherently violent. There are certainly cases in which it could involve a risk to the public, but there are also cases when it doesn't, and so I think there's no inherent violentness. Kimball announced this kind of inherent violent idea, and I think part of that was based on this relatively unprecedented consensus between the three branches of government that drug dealing, you know, is an inherently violent crime, and again, the focus was on firearms, not just a risk to the public abroad, but that if you are drug dealing, you might misuse a firearm. But evading arrest, even in its kind of worst... Which one is that? You were saying Kimball, but maybe you have in mind... Kimball was Judge Engelhardt's opinion, right? About... Kimball was the 922-G1 where the underlying conviction was drug dealing. Yeah, I should know that since I was on the panel. That's all right. Since I was on the panel, that one's clearly correct.  That's the inherent drug trafficker. Judge Engelhardt was the user. And I think this court really needs to be careful about taking that inherent violent crime too far down the tracks because it starts to look a lot like policy arguments. It starts to look a lot like judicial deference to legislative interest balancing. Oh, is this inherently violent? What does that really mean? Again, I think Kimball is unique because in the among all the different branches that this is violent, but we don't really have that for sure for evading. I'm just curious. I mean, I take your point that we should do an elements analysis or that that would create problems. What are the elements of evading arrest that are at issue here? What is that crime consistent? I think it's evading arrest knowing that somebody is a police officer. And I think here we also have... There's some elements about using a vehicle to do it. Is that part of the crime? Evading arrest with a vehicle? It is. It adds a certain level of punishment. Under Texas law. He was convicted of that under Texas law. He was, sorry. You know, the Sixth Circuit requires a fact-specific dangerousness determination by the district court. That's right. In the Williams case, considering all criminal history and the details of the predicate convictions, not a categorical approach. I think at some point you said we should do a categorical approach, but there's a problem with that in our case law already. But it also, it has the burden on the criminal defendant to prove that they're not dangerous. So is that... What do you think about that? So Williams already conflicts with this court's precedent. And Kimball kind of made that very clear in its last paragraph, that this isn't kind of a wide-ranging analysis where we're looking at everything and trying to figure out, are you dangerous? This has to be a predicate by predicate analysis. And as Judge Duncan pointed out at the beginning, that's because the text of what 922 G1 prohibits. And so I think the best approach is to look at a particular felony and ask, is that violent in the sense that it almost necessarily leads to actual violence? That it makes it more likely that the person who is going to commit that act, if they are armed, will pose a danger because they're likely to point a gun and shoot someone. And in this case, there's just no evidence that anyone thinks that evading arrest is that kind of felony. So evading arrest, it's not inherently violent. As Judge Englehart's hypotheticals laid out, it can involve a huge range of activities. Well, it would be strange, though, if we had a jurisprudence that said some people who evade arrest can be disarmed, but others who evade arrest can't, and they're convicted of the same crime. Yeah, what do we do with Reyes if we were to do what you say? Well, Reyes, I think, can also be limited to its facts, because he had a conviction for deadly discharge of a weapon. But you argue against a fact approach. And so that's why, are we doing, do you want a fact approach, or do you not, you want an element, a category of crimes approach? Chief Judge Elrod, I will be honest, in my case, it doesn't really matter, because the facts do not show that Simpson was violent when he was evading arrest, and the crime itself. But I'm saying, I think Reyes can be limited to, besides evading arrest, we can put that to one side, he also had a conviction for deadly discharge of a weapon, which is a misuse of a weapon. That alone is enough under the violent, you know, Bullock, Schnur, Betancourt. You know, discharging a weapon, that falls comfortably within the going arm laws. You're misusing weapons. Well, I mean, yeah, the problem is, it says, it says examples of Reyes' violent conduct include one, a 2008 felony conviction for evading arrest with tension. And for deadly, yeah, so I think, you know, that is one way to limit, I mean, looking into the facts is problematic, but it's also something that Reyes clearly did, because there's a footnote showing why that evading arrest was violent conduct. Reyes doesn't say evading arrest is an inherently violent crime. We can disarm anyone who commits evading arrest. It just says that, in this case, it was violent conduct. So I do think, I mean, there is tension in this court's precedent about whether we can look to the underlying conduct. Well, I mean, yeah, and it's understandable. I mean, we're feeling our way after Rahimi. Absolutely. What exactly is the approach? I agree. And the Supreme Court sort of leaves us with this broad brush approach, and then kind of lets the middle management clean up after it. I would be happy if the Supreme Court cleaned up a little bit. It would make my job a lot easier. It's very difficult, and most circuits still have not weighed in, or have painted with an even broader brush to say, we're going to uphold anything that shows you're not law-abiding. That's like the second circuit says that, constitutional as to all felons, including non-violent felons as a class. I think that's... So if you go that far, you know, so either they're going, we're the ones working in the middle here, trying to figure out this crime, that crime, whereas the other circuits either haven't gotten there yet, or they're not going to get there because of the way they answered the first question. So we're in a unique position, except for perhaps the sixth circuit, which has chosen a different path. I'm trying to go through all the circuits. Seventh circuit may have some room, but hasn't yet articulated it. The third circuit allows for case-by-case challenges, range, you know, struck it down as applied to somebody with a food stamp fraud... Perspective challenges, though. Right, I'm not... That's not, it's an interesting... I'm sorry, I have a little chart and I'm trying to work off of it. Are we in a, where are we vis-a-vis the other circuits? And that tells us whether or not the Supreme Court is, sometimes that's an indicator of whether the Supreme Court is going to get involved in the discussion if we have enough percolation. I'm not sure we have enough percolation at this point. I think, Chief Judge Overhead, there's been quite a bit of percolation. We're percolating right now. But in other circuits, off the top of my head, the third and the sixth circuits also allow for some as-applied challenges. They differ from, I mean, even within the courts that allow those, they differ as to the analysis. And then off the top of my head, the second, the ninth, the tenth, the eleventh, and the eighth... And the fourth. And the fourth, thank you. Yes, that is Hunt. Those circuits have all said that it's constitutional across the board. So I don't think we're waiting on a lot of circuits to weigh in at this point. So they're not going to get into it. The third has said that individualized fact-finding needs to be made by the district court, considering all criminal history, post-conviction conduct, and the predicate offense, and its underlying conduct. So they have gone with a very detailed fact thing, more similar to the sixth circuit. That's right. But even more specified, perhaps.  So, okay. Thank you. You know, we appreciate that you are very helpful and knowledgeable. We've had you before on these kind of cases, and we appreciate that you're very well prepared, always, for your clients. I appreciate it, Chief Judge Arnold. Thank you. Thank you. May it please the court, Stephanie Kenyard for the government. Mr. Simpson has a very lengthy criminal history that justifies his disarmament. His felony record begins with retaliation, when he threatened to assault and murder a police officer, was then followed by unlawful possession of a weapon by a felon. Just one year after his parole period ended for both of those crimes, he evaded arrest with a vehicle. In that case, he attempted to evade an officer, accelerated, lost control, crashed into a brick wall, and simultaneously was engaged in the dangerous combination of carrying a loaded gun and cocaine together. And just two years after he finished serving his criminal sentence for those three felonies, he was again convicted of felony evading arrest. This court has set forth in Schnoor and Bettencourt that one thing it will look for in assessing dangerousness. The test is whether or not the defendant has shown he poses a threat to public safety. And in this case, the government posits that Mr. Simpson's six felony convictions, some of them taken individually, but certainly all taken together, occurring over a period of 24 years, establish that he poses a threat to public safety. Is it a problem, the retaliation conviction, as I understand it, was not raised by the government for the district court? So it was raised. It was in our motion to dismiss briefing. It was not the focus of the briefing. So in the motion to dismiss response, the government said, you know, I think at that point we were trying to really include everything. And we pointed out that in addition to lengthy misdemeanors, he also had retaliation, but we focused our briefing heavily on evading arrest, drug possession, and a loaded firearm. You know, I guess to be perfectly frank, we're looking for, I mean, I'm looking for the safest route here because the Supreme Court has kind of left it open. The circuits are trying a variety of things. And I'm wondering, what is the most reasonable, solid ground to ground on? I mean, Chief Judge Elrod just talked about an approach in, I think, the Third or the Sixth Circuit that looked and, you know, required this detailed fact finding. I don't think we've gone there yet. Well, certainly in every case that I would classify, putting Kimball aside, which found a category of dangerous individuals who have been drug traffickers, in the cases where this court has looked at whether or not there's dangerous conduct that indicates a threat to public safety, it has always looked at felony convictions specifically and the underlying conduct. And that was true in Betancourt, Bullock, Davis, Reyes, and Schnoor, which I think are really our universe of cases. And while we haven't in this circuit gone as far as the Sixth Circuit would in also pulling in misdemeanor conduct and an entirely holistic view, the government is not opposed to that, but that is not what this circuit is doing, I think that Judge Thapar explained well why you would look at underlying conduct. And that goes back to historical analysis. When we're evaluating dangerousness as a ground to disarm, that isn't something that we have invented whole cloth in the 21st century. It is something that, as Judge Thapar explained, judicial officials were tasked with, usually the justice of the case. And so they would make an evaluation in the surety context, in the going armed context, even under the Militia Act, whether or not somebody had shown a propensity, a past behavior that was indicative of future violence. And to do that, those judicial officials, I don't think, would have been limited to just a categorical determination of a past conviction, they would have looked at conduct. What do we do, though, if we've said in Kimball that we're going to do it this other way? So I don't read Kimball that way. The last paragraph, a Judge Smith's opinion, when he talks about what it is we're going to look for, the way that I understood that was to say there is a universe of dangerousness that relies on a category, drug trafficking. And when somebody has found to fall within that category, we're not making an individualized determination. And I also think he said very clearly we're not doing what the Sixth Circuit and Third Circuit have done when they look at conduct that was entirely unrelated to a predicate felony. So I think that would be misdemeanor. Is there a specific carve-out for a particular drug trafficking and that we set that to one side if it's not about drug trafficking? I think so. And I think that that also explains, you know, in the beginning of the opinion, when the court goes through the existing universes, right, we have the Diaz universe where you have a predicate felony that was punishable by death or forfeiture. That's one grouping. If you have one of those felonies, we're done. And then he points to the Schnurr line of cases, which is where I think we are, where we are looking for indicators that you pose a threat to public safety. And in those cases, this court has, in all of them, Reyes, Bettencourt, Bullock, looked at underlying conduct. Then you have the third category, which is jiggly of war. If you were on supervised release, parole, probation. But then I think Kimball does do something different. Excuse me? That's easy. That's Robert. That's Robert's yesterday.  I mean, you've got certain crimes. Pick one. Aggravated assault. Yes. That's in my record. Felony aggravated assault. I cannot imagine a court saying, well, we have to look at the underlying facts of the aggravated assault to figure out whether it was violent. And of course it was. And those cases might be easier, right? They may certainly present a much easier fact. Frankly, when we now see aggravated assault, we move for summary affirmance, because that is... Sure. Well, we have a case, well, we have something similar to that. I mean, but the evading arrest is, we're going to judge, Judge Inglehart earlier said there's all sorts of ways to evade arrest. So I think, because I grew up in the 80s, the guy in the fugitive, you know, Harrison Ford, he's running away from the martialist. But he's not violent, right? He's impersonating a doctor, right? Because he was a doctor. But then you've got, you've got the guys in heat over at Getaway with Steve McQueen, and they're racing through the traffic and they're hitting people and firing guns. So you've got two different kinds of evading arrest. You do. So first, I would point out that here we have evading arrest, which has risen to the level of a felony. And in Texas, that requires that a person intentionally flee someone whom they know to be an officer of the law, who is trying to effectuate a lawful detention or arrest, and it has to be with the vehicle, or it has to be that you were previously convicted of this very crime. So we're only looking at repeat offenders. So that's a little bit more granular than, well, evading arrest. It is. It is more granular. And I think that the presence of the vehicle here is important. And certainly in this case, we know it was an evading arrest that was done so chaotically and dangerously that it ended in a crash. And in this instance, too, it isn't just the evading arrest. This is an instance where somebody who was evading arrest while carrying a loaded weapon as a previously convicted felon and cocaine. See, my problem with that, that's when he was evading arrest. He had the cocaine. He had the gun. He did. That wasn't an element of the crime, though, right? That wasn't required to be found by a jury when you convict him. It was not an element of the crime. So I think that's just us looking at the underlying records going, hey, he had a gun. It does. But in this instance, that is in the PSR. And this is a case where the PSR was entirely unobjected to. And he admitted that as his conduct, didn't he? That he had the controlled substance, cocaine. He admitted that. And that he, I thought he did. Yes, and he was convicted of felony possession. So I don't think, I mean, first, I think in a case where there were no objections to the PSR and its descriptions of underlying conduct, this court can and does, in its past cases, take into account the description of that conduct that is not objected to information. And I don't think this court is required to disregard the fact that, in this case, we have three felonies combined at once, and how that may impact the dangerousness analysis. I'll point out, in Reyes, this court did say it is violent conduct when somebody was evading arrest. They ended up going through a stop sign. They sped without their headlights. But there, there wasn't a collision. I don't think that it is meaningfully different than the dangerous conduct we have here. There was a mention in the footnote that describes it, that at the time, the officers had been responding to a drive-by shooting. But that footnote does not say, and I think it would require an inference to say that he was involved in the shooting. In that case, the only criminal sentence that is mentioned is he proceeded to get three years. That was related to evading arrest. It's kind of a two-part thing. We're applying a statute, 922G1, which requires, I forget the wording, but that he had been convicted of an offense punishable by more than a year. And then we need to go to the constitutional part and say, well, as applied to the constitutional challenge, does applying that statute to this person violate the Second Amendment? Right?  And I think that, you know, in doing so, this court has, it does look at those felony convictions and the underlying conduct to really get... We couldn't, just to push it, we couldn't say, yeah, he was convicted of this evading arrest. And you know what? He was also convicted of this misdemeanor, and it was kind of dangerous, this misdemeanor. We couldn't do that. So in this circuit, this court doesn't do it. You know, the government has no opposition to the Sixth Circuit approach, which really would take a holistic view. And we think that that would be consistent with historical practice. It would also be consistent with Section 925C. And I'd like to bring that up as a relief valve that I think this court is going to see being used in more and more cases as it comes back. But under Section 925C, a... Okay, I'm sorry, you do that, and then I'll ask. Well, so under Section 925C, somebody who has lost their gun rights has the opportunity to apply to the Attorney General, ask for them to be returned. And the determination is made by looking at their entire reputation and record. And the analysis that the Attorney General does is to determine whether or not giving them a gun would be dangerous to public safety or contrary to the public interest. That is the test used. That has not been brought up in existing cases because the Attorney General had delegated that authority to review the applications to the ATF, and Congress specifically unfunded it and its appropriations bills beginning in 1992. But that has changed this year. It is now back in the hands of the Attorney General. And the proposed rulemaking went up two weeks ago. Well, we asked about this in June. Yeah. So there's been... Right now, nobody's trying to file one of these? Not that I'm aware. So on July 22nd is when the proposed... The notice of proposed rulemaking went up. And so this is in the public comment period. I was actually looking at it, you know, two days ago. Do they have to wait? I don't know. I'm afraid that's... Do they have to wait to file an application? I do not know, Your Honor. Does Rahimi's analysis help us to narrow the things we can consider? I didn't correct me if I'm wrong. It's been a while since I read Rahimi. Doesn't Rahimi talk about a judicial determination of dangerousness? It does, but I don't think that Rahimi was saying that is always necessary, right? Because Rahimi was asking the question about whether a statute that did, in fact, require that previous judicial determination was constitutional. This wasn't G-1. It was G-something else. G-8, 9, something like that. And I think that this case actually is like Davis, which is unpublished from this court, but was one of our 28 J's. And there, this court did take note of the fact that at sentencing, the district court imposed an upward variance, and in doing so, pointed out that the criminal history of the person before them, Mr. Davis, indicated an ongoing threat to others. That's more like the Sixth Circuit approach, isn't it? And also, that case has cert pending, isn't it? We still follow our cases, although that's an unpublished case, as you pointed out. I think that's right. It is unpublished, and he does point to Mr. Davis did have a habit of brandishing a firearm at family members. It's not a good record. But in this case, Judge Counts also imposed an upward variance on Mr. Simpson, and in doing so, he looked at felony conduct. He specifically pointed out, you have been in trouble constantly, you have an affinity for firearms, and an upward variance is necessary to protect the public from future crimes. So I don't know that that is necessarily an all-force, you know, on-all-force judicial determination, but I do think in this case, the district courts did make a determination that this person is enough of a threat that a higher sentence from the 30- to 37-month range, up to 60 months, was warranted. If could we pivot at this point to a requires fact-specific, dangerous determination by the district court and determine that there was, in fact, one in cases other than certain categories like drug trafficking. Could we do that now, or are we too far down the path? I guess I, are you saying... That's a path to affirmance, basically arguing what you're saying, that the district court here was very careful, didn't make this individual as dangerous in its determination. That's what the Sixth Circuit would allow. You believe that's very textual, as Judge Tappar explains it. Yeah. Can we do that, or are we bound that we can't do that? I guess, are you asking, can you remand and have them do... No, I'm saying Judge Counts already did that here. You said that... Yeah. ... went through the facts, the dangerous, determined that he's dangerous, he's been doing this, so went through in detail. Yes. Did the things that you would want the district court to do, and you can certainly respond to this in your rebuttal, and you can say you didn't do, but assuming argumentally did, why would that be a reason to affirm? Could you just affirm based on the fact that he made that fine? The district court made a dangerousness, determined that he's dangerous and he's been such a chronic criminal, for lack of a better word.  Recidivist, and he's doing all kinds of dangerous things over, that could be dangerous over a long period of time, and he made a big point of that, and did do an upper variance, and, or was it variance? It was, yes. And therefore, in this case, it was appropriate. How would you... If that doesn't work, are you saying that doesn't work, or you're just not sure? You know, I think it could work. I mean, I do think we have a judicial determination, but I don't know that he necessarily went through everything. You don't think he did it as detailed as he would need to do it for this type of... I think it probably is okay. I do. But I don't think, you know, in this case... I think both routes are open. I think this court could say, we do have district court at sentencing. I guess, frankly, a little bit of me is troubled to say that his sentencing considerations map on exactly right to what this court has done when really looking at how the different predicates come together and what happened in the underlying conduct. I guess I wouldn't want to... I do worry a little bit that those don't map on quite perfectly. Would you map this with Schnur, or would you map this with Reyes? What is your path to affirmance? I think that Betancourt and Reyes and Davis are the path to affirmance. I think that Betancourt very clearly tells us, you don't need conduct with a firearm. You don't need... If you did something that really was dangerous and put others in danger, and Betancourt involved very dangerous conduct with the vehicle, then you pose a threat to public safety. I think that Reyes is even more useful because there was a constellation of predicates that look like our case. Evading arrest, cocaine possession, even the evading arrest conducts looks very similar. While Reyes did have deadly conduct discharge of a weapon, what is described there wasn't firing at a person, and here we do have someone who has repeatedly been convicted of unlawfully possessing loaded weapons. Okay, this is maybe what Judge Inglehart already asked you, but we're assuming, aren't you, Endo, that the facts of this were that they were arresting him at his home, and he gets in his car and then immediately hits the side of the garage, and there's nobody lives with him, and the police officer's far away, and so there's no real dangerousness, and he's immediately hitting just on his own side of the garage, so he's not out in the public. Does that matter? I don't think it does. I think that, you know, as the Texas courts have told us, and we know in our brief, the intent of having felony evading arrest is precisely to avoid these kind of dangerous situations, and I don't think that, you know, the happenstance that somebody ran into their garage door, ran into a brick wall, or ended up colliding with another car changed the fact that this is conduct that is extraordinarily dangerous. I also, you know, we have spent a lot of time on evading arrest. That is not the only thing in Mr. Simpson's felony record. He does have a felony conviction for retaliation, and the facts of that is that he threatened to assault and murder a police officer, and I think under the surety laws, where one could be disarmed if there was, if someone had reason to believe that they would be harmed by that individual, under this court's precedent, making it clear that posing a threat to the safety of others justifies disarmament, the fact that we have a defendant here who was convicted of threatening to murder a police officer should get substantial weight in the analysis, and while he was still finishing his time for that crime, he was convicted of unlawful possession of a firearm while serving time for retaliation, and immediately after finishing parole on both of those crimes, the next year we have felony evading arrest with a vehicle and cocaine and an unloaded weapon. I think you need to wrap it up. Yes, your honor. So given the historical, given his lengthy record taken together, we ask this court to affirm. Thank you. Counsel, I know you have a lot that you want to respond to, but let me ask you, maybe this, hopefully this is something you already have planned to respond to, putting aside the most obvious violent crimes, like an aggravated assault, like Judge Duncan had described, putting those aside, why could the court not consider, or maybe you think they could consider, crimes or arrests that are listed in the PSR? Frequently those are only allegations from law enforcement, like a police report or something of that nature, or something from an FBI agent that's recited in a PSR, if it's not objected to, and you heard your opponent say that there was no objection to the PSR in this case, or factual basis that are in connection with a guilty plea in either state or federal court, a stipulation in state court, why could the court not consider that when making this determination as to dangerousness? Judge Englehart, I want to distinguish between the two. I think guilty plea type statements are fine. I think the PSR statements that come from police reports or witness interviews, they're never tested in the crucible of the adversary process. You know, it could be a witness that, and I think this case shows the difficulty in that, because some of these convictions are so stale that going back and trying to reconstruct that, I mean... But doesn't that go to my... The first part of my question is about an objection, that that's not what happened, that that's an accusation. Wouldn't the defendant or defense counsel need to object to the PSR because the judge typically asks, if you understand the PSR, do you have any objections to the PSR before I sentence, wouldn't it be incumbent on defense counsel to say, we object to paragraph number 19 because it describes what I have alleged to have done, and that's not what happened at all? Or is it just plain error if you don't object, then the district court can consider it as fact? So I think to object, this court's precedent requires the defendant to come forth with evidence showing why it's wrong. I don't think it's enough under... And usually these are sentencing issues, not under... So I want to make... That's a pretty big distinction. Because the universe of sentencing is much broader than what we can consider for the actual conviction. But so for his retaliation conviction in 1991, which I want to get to in a second, he could say that's not the way it happened, but he's got to find witnesses from 32 years ago and go track... That's just a very difficult thing to do. And if we object to it and just say that didn't happen, the district court's going to say, well, I have some evidence that it did. There's a police report or a witness, whatever the PSR is based on. So I'm overruling your objection based on a preponderance of the evidence and not the same kind of heightened conviction, proof beyond a reasonable doubt that's really important. So I think there's problems with relying on those underlying things, and especially when there's not... They're not aired. And when you plead guilty to a certain crime, you might not care whether the police report says you assaulted someone in the context of whatever the crime you plead guilty to, because it isn't relevant to what you're pleading guilty to. Okay. One of the big things I want to get is the government keeps saying dangerous, dangerous, dangerous. The test under the Second Amendment is not dangerous. How do we know that? One, this court said it in Connolly. This court said there is not one piece of evidence that the founders believed that Congress could disarm anyone it thinks is dangerous. It's got to be narrower than that. Two, the Supreme Court rejected this exact same argument in Rahimi. The government argued that Congress could disarm anyone who's not responsible. And at oral argument, they made very clear responsible means dangerous. And in this case, the government's brief from footnote two to seven and from footnote 10 to 13, they cite 76 sources that just copy and paste the government's merit brief in Rahimi on an issue the government lost. So dangerousness is not the standard. That's a one-way street to follow. What do you mean? I tend to agree with you. What do you mean? What do you mean if dangerousness as a category is not enough? What do you mean? Violence. And I think Bettencourt, Bullock, Schnur, Reyes, they say kind of dangerous and violent, but they all come back to this violence, a proclivity for violence. And that's what then-Judge Barrett said all the way back in Cantor v. Barr. She said, we can disarm people that have a proclivity for violence. And that's what the Supreme Court kind of emphasized in Rahimi as well. We're out of time, but I do want to hear what you have to say about the retaliation point. OK. One, it's waived. They didn't argue it in their motion to dismiss. In fact, the way their motion to dismiss is written, the defendant's criminal record shows that in addition to several misdemeanor convictions, which aren't relevant, and a felony conviction for assault retaliation, he has a history of dangerous criminal conduct. That's the only time they mention retaliation. And in that context, they don't even think that it's a dangerous crime. They're lumping it in with his misdemeanors that we obviously can't rely on. It's not in the factual basis. So it's waived. And this is the government's burden. They need to air their historical analogs in the district court. The second thing is that Rahimi talks about a credible threat. There's no doubt that my client made a stupid statement when he was arrested in the heat of the moment. But he got probation for this. So there's no credible threat. If my experience in the Western District of Texas has taught me anything, it's that if a state court judge in Midland thinks that somebody poses a real threat of killing a police officer, they're not going to give him probation. And the third thing I want to say about it is that the government admitted that surety laws are kind of the best analog for these. But in Rahimi, the Supreme Court said one of the important features of surety laws is that they are temporary. That was something the Supreme Court made very plain. This conviction took place 32 years ago in 1991. So certainly, a temporary restriction does not justify disarming him now for that. Thank you. Can you, I'm just, perhaps you don't have an answer to this. I'm puzzled. How can these other circuits say all nonviolent felonies? I think it's OK for all of them after Rahimi and the points that you just made. So Judge Elrod, I think they've kind of relied on two different approaches, kind of. A lot of them have said, our prior circuit precedent said 922 G1 is good across the board, and Rahimi didn't. They used some pretty aggressive language for what the Supreme Court asked them to do to overrule circuit precedent. So that is one kind of approach they've taken. Another is just placing a lot of weight on the Supreme Court's dicta, saying that these laws are presumptively lawful, even though the Supreme Court obviously wasn't analyzing 922 G1. So even if they had previously followed this method, which has been renounced, they haven't revisited because they haven't believed it was a clear enough declaration. Right. And I should add, the Eighth Circuit, and maybe the Ninth a little bit in their recent Ambon decision, have said that Congress can disarm anyone who they think is dangerous. And the Fourth got certain eyed on their survey.  I mean, I got certain eyed in Diaz. I tried my shot at it. The Fourth got certain eyed. There are a couple pending, but there haven't been a lot. There doesn't seem to be a lot of desire to take it out. But we'll see what happens. Thank you very much. We appreciate both your arguments. Very helpful. Both arguments are very helpful. This case is submitted. The court will stand in recess until tomorrow morning at 9 AM.